Okay, so Ms. Shapiro, I just want to make sure I've got the time right. So you folks are splitting the 10 minutes, so five each, and one minute of rebuttal each, so four to start. Is that right? That's about the extent of my math abilities, so I don't push it. Yes. All right. You may proceed. Thank you, Your Honor. May it please the Court, my name is Alexandra Shapiro, and I represent Xi Zhang on this appeal. I'd like to focus my limited time on the Brady issue, which is fact intensive, and then, time permitting, briefly address our other two issues. There were multiple Brady violations in this case, which collectively require a new trial. The Brady material goes to the core of the defense, which is that Mr. Zhang was never in the getaway car or at the scene. For instance, the government argued that testimony by one uninvolved witness placed a Breyu in the murder car and meeting with Zhang just hours before the shooting, but the government suppressed statements from another witness who would have placed a Breyu in a different car from a different era. This is the Rodriguez statement you're talking about. Correct, Your Honor, and not meeting with Zhang. The government also suppressed evidence from its own case agent that would have directly contradicted its own closing arguments about the lighting at the scene. Could we start with that one? Because it seems to me that even if you're right about that, there is obviously daylight, so to speak, between the testimony at trial about the lighting and what the officer would have said. But there were other witnesses who already covered that, right? There were multiple witnesses who testified about the lighting, therefore contradicting Yu Yu's testimony. Isn't that right? Well, yes and no, Your Honor. I think the critical point here is that the government—so the defense called a reconstruction expert, but the government essentially made fun of him in their closing, pointing out, and stated that there was much light and how bright it was and how he couldn't have known because he went to the scene in 2023. But those statements were directly contradicted by its own case agent's statements in the grand jury that the defense had no way to know about or present to rebut that. But there was a transit officer who was on the scene at the time of the murder, and he testified that the lighting conditions were, quote, dismal at best, right? And then there's the first responding officer who says that it was dark. I agree with you. I'm not disputing that. My point is that— So you're saying a third witness would have made a difference? The government—well, just let me say a couple things, if I may, in response to Your Honor. First of all, I think what's critical here is that the government made a false statement to the jury in its rebuttal knowing that its own case agent, who was investigating this case from the outset, had said the opposite of what it was saying to the grand jury. The defense had no opportunity to present that. But also taking a step back, and I think this is absolutely critical, the court has to assess all of the suppressed gradient material in determining whether there was prejudice. The court cannot simply seize on one piece in isolation. So you have to consider not just the lighting issue in isolation, but together with the impact of the suppressed Rodriguez statements and testimony. And those were incredibly important. As I mentioned earlier, you know, there's this issue of the car, and you have Bourbono testifying that he sees a Breu in this car that matches the description of the car seen on the video as the getaway car from the murder. And I want to highlight a couple of things. Mr. Rodriguez said, who was the owner of a car repair shop, was an expert in cars, said that the car was a significantly earlier vintage. And this is not in the appendix, but in the district court docket at 340 Exhibits D, E, F, G, and H, you can see pictures of the same Honda Accord from the era that Rodriguez dated the car to. And as some of us in the room may recall from that era, the cars were boxier. And if you look at that and compare it to the USB drive that we've submitted as part of the appendix with the video footage at time stamps 159 and 1322, you can see that it's a quite different looking car. So that's number one. Number two, Mr. Bourbono testified that he saw a Breu talking to an Asian male who was in a Mercedes, a white Mercedes. And Mr. Zhang has a white Mercedes. And the government made significant hay out of that in its closing arguments. Mr. Rodriguez, on the other hand, said that at the time that a Breu was seen meeting with what he said was a group of Asian males, Bourbono was actually inside the garage parking the other car and couldn't have seen that. So these were very significant pieces of information. The government leaned heavily on Bourbono's testimony in its rebuttal and in its closings to wink Zhang to a Breu just hours before the murder. And this was absolutely critical. And, you know, the standard for prejudice is not that high for the defendant. The Supreme Court and this Court have repeatedly held that if there's any reasonable likelihood that the suppressed material could have affected the jury's judgment, the defendant is entitled to a new trial. I see my time is up. Oh, it's way up. It was up two minutes ago. But go ahead. We'll let you get to one other point. Just real quickly. In addition, the murder for hire statute does not convert any garden variety state murder crime into a federal offense. And this Court has repeatedly held that Section 1958 proscribes a very limited category of behavior and requires proof of a bargain for exchange. And we submit that the government failed to prove the pecuniary value element here. All right. Well, you've got a minute for rebuttal. We'll now hear from Mr. Lash. Thank you, Your Honor. May it please the Court. My name is Joseph Pace for Pallon. Oh, I'm sorry. I jumped before. Lash is over there. Sorry. Mr. Pace, apologies. That's okay. I think for efficiency's sake, I'm going to focus my remarks on the due process issue. And to avoid confusion, I might use some first names. This case represents a vanishingly rare example of a mid-trial shift in theory of guilt that causes irreparable prejudice to the defense. Section 1958 requires proof of an agreement prior to the murder to commit the killing in exchange for something of pecuniary value. And on day four of the trial, the government revealed for the first time its theory that Allen had commissioned the murder in exchange for the transfer of Amico. There was no prior notice of that theory. In fact, from inception, the government had telegraphed a different theory altogether, that Allen Yu had commissioned the murder, quote, in exchange for cash. It laid out that theory in six sworn search warrant affidavits. Now, the government never contends with that statement, with any of those six statements in the affidavit. Instead, what it does in its brief is it seizes on an affirmative in the affidavits that Zhang was willing to accept cash or a stake in Amico. But there's nothing in the affidavits indicating that Allen offered a piece of his company. To the contrary, the affidavits make clear that Allen Yu offered the conspirators cash, that Allen Yu, in fact, paid cash. And then you have 17 subsequent months of submissions describing those cash payments. Now, there is, to be clear, some dispute as to whether or not the 3,500 materials provided notice that the government might pursue some sort of non-cash theory of consideration. We, of course, acknowledge that the proffers do make some reference to a promise of, quote, real estate contacts or business connections. As we explain in the brief, we vigorously dispute that that notice was sufficient. However, there is one point as to which there is no genuine dispute. The 3,500 materials never disclosed that Allen was going to be offering up Amico or that Yu understood Allen to be offering up Amico. And if we had had any inkling that the government intended to argue that the parties had agreed to murder in exchange for Amico, we would have mounted a very different trial strategy. But just to be clear, I mean, below you brought a constructive amendment argument and a prejudicial variance argument, but not this argument, right? Well, Your Honor, I think— This is a broader, more kind of freestanding, unfair surprise argument. Your Honor, it was stylized below. The formal label that we affixed to the claim was constructive amendment and prejudicial variance. But I think the underlying principle that the government had misled us throughout the course of the pretrial hearings and then sandbagged us in the middle trial, that argument was very clearly made. Now, of course, we're not hewing to the labels here because we recognize that both of those doctrines require some discrepancy between the indictment and the trial evidence. Obviously, that's not what happened here. But the due process principle is much broader than that. And, for example, in Siddiqui and Sanjuan and Lopez, in all of these cases, the courts found that there was substantial prejudice, even though the ultimate theory of guilt was contained within the indictment. The § 22 affidavit said that Zhang agreed to participate in the murder in exchange for a stake in or payment from Alan Yu's company. I mean, doesn't that encompass both theories? No, Your Honor. What that tells us is that Zhang was willing to accept multiple forms of consideration. But for murder for hire, there has to be an agreement. There has to be an acceptance, and there has to be a— Well, either of those is something of pecuniary value, wouldn't you agree? I'm sorry? Either of those is something of pecuniary value. Absolutely. And if there had been something— But, again, there has to be something—there has to be an actual offer. So we know. We know that Zhang was willing to commit murder for a bunch of different things, including a stake in Amico. But there's nothing in the record that indicates that Alan Yu actually offered a piece of Amico. All of the evidence is that prior to trial is that Alan Yu commissioned the murder in exchange for cash. That was the nature of the agreement. That was the agreement that we were prepared to rebut at trial. And so, again, if we had known that the agreement was supposedly Amico, we would have pursued a different trial strategy. We would have embraced—we would have amplified the government's theory that Amico was circling the drain, a theory as to which there was an abundance of evidence. We would have invited Yu to testify that he knew Amico was facing existential headwinds. And then we would have argued that it is utterly implausible that somebody would agree to commit a death penalty offense for a piece of a defunct company. That was our strongest line of attack. And by the time Yu Yu took the stand on day four, the defense had forfeited their ability to pursue it because they had spent the previous three days of trial attacking the government's theory that Alan killed Chris Gu to salvage Amico. Defense counsel stood before the jury in opening statements and said that that motive theory makes no sense because Amico is doing just fine. And then he spends the next three days of trial impeaching the government's witnesses who were supposed to establish that Amico was doing poorly. He actually successfully objects to testimony that would have established that Amico's troubles were a well-known fact in the community. And after all of that, the defense is in no position to challenge whether Amico is something that's worth killing over. You can't unscramble that omelet. By day four, the damage was done. It was irreparable. And at that point, the only answer is for a retrial. Thank you, Your Honor. All right. Thank you very much. You reserved a minute for rebuttal. Thank you, Mr. Pace. And now we'll hear from Ms. Lash. Good morning, Your Honors. May it please the Court. My name is Devin Lash, and I'm an assistant United States attorney in the Eastern District of New York. I represented the government below before the district court. I'd like to start, Your Honors, with the Brady issue that was raised first. First of all, I want to correct a misstatement on the record that counsel for Mr. Zhang said defense had no way to know about the lighting conditions at the scene of the crime on the night that the murder occurred. That's factually incorrect. Brady protects facts, not documents. And what happened here is the defense received every photograph, every video, and every statement of the witness who was present at the night of the scene. With that information, as the court pointed out, two of the government's witnesses testified that the lighting was dark or dismal at trial. Counsel pointed to statements by Yu Yu that the lighting was bright. What Yu Yu was talking about was a block over by the Home Depot that night, and that's where he witnessed Xi Zhang and the shooter, Anthony Abreu, in the white Honda getaway car. So the statement about the lighting that night was specifically cabined to that area of the scene of the crime. So the Lin testimony, as we argue in our brief, was not suppressed because the defense had the information at the time. It was also not material because, again, four government witnesses testified about the lighting, including one defense witness who was called as a crime scene reconstructionist. Furthermore, it wasn't prejudicial because the lighting was referenced repeatedly in the defense closing, and the defense argued that the lighting was dark and it was difficult for the individuals in the car to see the person who left the victim who left the restaurant that night. Well, yeah, I guess that's the point. If there were another witness, a third witness who said it was dark, it would have been a more compelling argument. Three is better than two. You're disputing that. Yes, Your Honor. Two is better than three. No, Your Honor. We think the two is sufficient here. But a third reason that I'll point out is what the district court referenced in the district court's Rule 29 decision, and that's in the special appendix, that ultimately this is not material because what happened here is when the shooter got out of the car and walked up to the victim, he stood mere feet from him, looked him in the face before he pulled the trigger. So if there was a question of whether or not he could recognize him, there's no question at the end of the day that he did recognize him. I'll move now to the Alexander Rodriguez testimony. So first of all, the argument is that the Alexander Rodriguez testimony impeached the testimony of Roberto Burbano, who the government called as a witness at this trial. The Roberto Burbano testimony was not core to the issue of this case, which is whether Alan Yu hired Xi Zhang to kill the victim, Priscu. Roberto Burbano was a tertiary witness on this point. Now, Roberto Burbano's testimony, he testified that five hours before the murder, at about 9 or 10 p.m. that night, he witnessed the shooter, which is a defendant who was not tried at this trial but a separate trial in April of 2023, driving a white Honda sedan with a temporary license plate, wearing a specific set of clothes and purple gloves, and meeting with Asian men, one of whom was driving a white Mercedes. Now, the district court recognized that the Alexander Rodriguez testimony was in large measure aligned with the Roberto Burbano testimony, and that's at Special Appendix, page 18. Now, the Alexander Rodriguez testimony he talked about, it also occurred at around 9 or 10 o'clock that night. He recognized that the shooter, Anthony Abreu, was driving a white Honda sedan. Counsel pointed out that he initially thought that that white Honda sedan might be one from the 80s or the 90s, but if you look at the grand jury testimony, right after that he says, but I can't be sure, I only remember that the car was white. Nor did Mr. Rodriguez testify that he was a car expert. He owned an auto body shop. But there's no testimony in the grand jury that he was an expert in automobiles or Hondas. So, again, not to the core issue of the case, that the Alexander Rodriguez testimony and the Roberto testimony were in large measure aligned. And the core issue of the case, that Alan Yu hired Zizang to kill the victim, Chris Gu, the government presented abundant evidence that that was the case, and that included two cooperating witnesses who were both in the inner circle of the scheme. We presented Zizang's text messages in the months after he was hired by Alan Yu, before he carried out this murder, talking about the victim, his specific car, and where he lived. We presented the payments after the murder, that Alan Yu paid Yu Yu $150,000 in the months after the murder for carrying this murder out, plus other abundant evidence about the white Honda sedan and the temporary license plate that tied the shooter to the murder that night. Roberto Bourbono's testimony was also deeply corroborated by other evidence in this case. So, specifically, he talked about- Can we switch over to the cuneary value issue? Yes. What exactly was the consideration? The business interest and the construction company. That wasn't the theory all along, though. It was- It started out as cash, and you mentioned the $150,000 afterwards. What was that? I mean, there's a whole lot of things going on here, which is, I guess, some of the confusion, to say the least. So, the facts in the case were not simple, Your Honor. What happened was Alan Yu engaged Zizang and his nephew Yu Yu to carry out this murder for a business interest in this company. After the murder, when Alan Yu did not provide the business- It was not- The witness who testified about this, Yu Yu, didn't specify exactly. But what he said was that- And I can point you to the pages in the record. That'd be at transcript page 826, 957, 977, and 980. That Alan Yu would link us with real estate connections, basically passing on the company. And then, again, when questioned, he says he promised that he will compensate us, basically hand over the company. At page 977, he said we would take over the company. At page 980, he originally promised he was going to hand over the connections, the real estates, all that. So- He also said we'll run a company like Emico. And he said- A couple times, I think he said that. And he talked about the connections and his suppliers and other things that would be helpful to starting- It seemed like starting a new company. So, in any event, what do we do with that contradictory testimony from Yu Yu? So, a few things. I think you have to read Yu Yu's testimony as a whole. And when you read Yu Yu's testimony as a whole and you don't isolate a stray remark, he did not waver on the core point. That there was a meeting in October 2018 at Alan Yu's business office in Flushing, Queens, that involved himself, Zizang, and Alan Yu, where Alan Yu promised to give over a business interest in the company. The deal wasn't papered. There was no corporate attorney called. There was no discussion of shares or how it would be affected. But the statute doesn't require that to show pecuniary value. What was promised, a business interest in the company, clearly had pecuniary value. And I think that should end the inquiry here. We'll also note that this meeting occurred in Mandarin five years earlier, and Yu Yu testified about it in English. I think the defense makes hay about the fact that Yu Yu, you know, equivocated, used words like basically- Yu Yu's first language is Mandarin, not English. And if you look at his testimony, he used the word basically 26 times in his testimony. It's a tick, like some people say literally. It can't bear the weight that the defense is saying- that the defense is attempting to put on it. Yu Yu's testimony was also deeply corroborated. It was corroborated by the testimony of another cooperating witness, David Yu, who testified that Yu Yu told him that Zhang would receive an interest in this company around the time of the murder. It was also corroborated by Zhang's text messages in which he corresponded with Yu Yu and planned the murder before it actually occurred. And then again- Can you address what was the 150 that was paid afterwards then? That that's not a business interest in Amico. No, Your Honor. And when Yu Yu testified, he explained that after the murder, when him and his co-conspirators had not received the company, he turned to his uncle and said, to help us out, to help my friend, we want a payment in sub and substance. And on the stand, Yu Yu explained what that meant was he was tired of waiting and he needed the money now and he wanted the 150 instead of the company. And Alan Yu, we showed by financial records, text messages, Yu Yu's testimony, Alan Yu provided this 150 to Yu Yu for carrying out the murder. So I think I'd like to sort of shift, unless the court has more questions on the pecuniary value, to the argument made by Mr. Pace about our shifting theories. And, you know, I think that it's important first to note that the defense had notice. And they admit that they had notice in their brief. And that's at Yu Yu's brief at page 5 and 6. And the notice started with the indictment. The indictment charged that the defendants carried out this murder in exchange for pecuniary value, not money, not cash, something of pecuniary value. In the warrants, as the court pointed out, in two of those warrants, around the time that Mr. Yu and Mr. Zhang were arrested, the government provided those warrants that stated Zhang agreed to participate in exchange for a stake in or payment from Alan Yu's company. This statement was discussed and relied on in the suppression motions in December of 2022, nearly a year before trial. When you opened to the jury, in your opening statement, did you discuss what your perspective was with regard to pecuniary value? So in our opening statement, Your Honor, my colleague talked about that the jury was going to hear from Yu Yu, who was an inside man in this conspiracy and was going to tell the jury how it was planned. We didn't characterize Yu Yu's testimony. We didn't characterize any other witness's testimony. Yu Yu testified over— So you didn't cast your lot with what you thought Yu Yu was going to say. You spoke generally. We spoke generally, and we alerted the jury that Yu Yu was going to be discussing the plan before the murder. And it was Yu Yu testified about a decade-long relationship with one of the defendants. And, again, we didn't want to characterize his testimony. It's not scripted. It was open-ended. We asked him questions, and he spoke before the jury. So your theory was—the theory that you proceeded along, though, was that an owner of a company who gets upset with someone that he took in and helped, who then created a—became so successful at it that he competed with a competing company, turns to one of his relatives and says, If you'll kill this guy, I'll help you create a competing company of my own. Is that it? Doesn't this seem odd? No, Your Honor. Okay. And let me— And it's just me. Let me explain why. And so, first of all— Why would you—if you wanted to kill somebody because they'd done such a good job competing, why would you pay someone by doing the exact same thing again? So, Your Honor, the defense made all of these arguments in their closing arguments. Okay. It is not accurate to say that the jury didn't have this competing theory. Well, your point is this. That wasn't the argument we figured we should make. We figured we should be making an argument that he was doing quite well and so, therefore, he had no reason to kill the guy. And respectfully, if you look at page 81 of the government's opposition brief, we cite all of the statements—well, some of the statements that both defense attorneys made in their closing argument that this testimony was illogical and it made no sense and the jury shouldn't buy this theory because it didn't hold water. All right. But putting that aside, Judge, if any rational trier of fact here on the Rule 29 motion found this evidence sufficient, that's the standard that the court should— Is it your view that it could have been either or even in UU's mind that that would satisfy the statute? Would UU's testimony—if UU said, well, he told me he'd either give me something in the company or he'd give me cash, would that be okay? So, that wasn't UU's testimony. I understand the court— No, I understand that. I'm trying to explore the reach of the statute because a number of courts have had trouble with engrafting the word contract onto the liability under the statute, and yet the statute itself uses the word agreement, which I find curious. So, in your mind, is it—it would have been sufficient for UU to say, well, it's either or, he was going to give me one or the other? Yes, Your Honor. Okay. I see that my time is up. If the court has no more questions, I thank you for your time. Thank you. All right. Thank you, Ms. Dash. We'll now hear from Ms. Shapiro for a minute of rebuttal. Thank you, Your Honor. First, my opponent just stated that the government never mentioned any specific pecuniary payment in the opening. In fact, if you look at Appendix 319 to 320, you will see that on 319 the prosecutor said that there was a promise of $200,000 to UU and $30,000 to Zung, and on 320 they repeat that $30,000 was paid to Zung, which was for the marijuana debt. In addition, UU said, quote, he never directly said that Alan Yu would turn over the company. That's at page A581. He was asked, he didn't tell you he was turning over the company, and he responded, no, that's at Appendix 1318 to 19. With respect to the Brady issues, on the lighting issue, what the defense did not know was that the case agent had visited the scene and had agreed with the defense position. A case agent was involved in this murder investigation from the outset, and this is what the prosecutor told the jury in rebuttal starting at page A827. They talk about the defense theory, which was not that it was too dark to see Gu's face once the shooter was right up to him, but that it was too dark to know he was the person exiting the club from the getaway car down the street. And the court said, and the prosecutor says, you also know that the lighting conditions were completely different in his little experiment and looked nothing like they looked on February 12, 2019. You saw how much light was there and how bright it was. It was nothing like what their witness tried to recreate. And the defense had no opportunity to tell the jury that the government's own case agent disagreed with that statement. With respect to Bourbonno, it is simply not true that their testimony would have aligned in the critical respects. He repeated that the car was from the late 80s and the early 90s in an interview, as well as the grand jury's testimony. You can look at the record at A, 1926 and 1944 for that. And in addition, the case law is clear that, quote, reliance on potentially inculcatory aspects of a suppressed document is not a proper application of Brady. That's from this court's decision in Fuentes. There are numerous other cases from this court and the Supreme Court to the same effect. And the last point I'll make, I apologize, Judge Sullivan. You do know how lenient I am. I'm sorry? You know how lenient I am. Exactly. The broader point is that Brady isn't supposed to be assessed in isolation of the testimony and trial, but the court is supposed to consider what defense counsel could have done with the information in terms of further investigation and how it might have differently shaped the defense. Kyle's versus Whitley is one example, but we've cited others in our briefs on that point. Thank you, Your Honor. All right. Thank you very much. Mr. Pace. Thank you, Your Honor. Just a few quick points. The government says that we were provided notice of the indictment. The indictment did not specify what the specific nature of the promise was, nor was it required to. However, over the following 17 months, the government repeatedly telegraphed that the promise was cash. And a broadly worded indictment that merely matches the language of the statute does not obviate the obligation of the government to provide evidence when it realizes that its originally telegraphed theory of the case was incorrect. They were obligated to disclose UU's statements about the final nature of the promise under Jiglio, under Brady, under the 3500 rules, under the general principle that you cannot mislead counsels to the theory of guilt in a way that materially prejudices the defense. And they're, candidly, I don't think there's any real dispute here that they never put us on notice that Alan Yu promised the company. Again, they cite to the statement in the affidavit. The affidavit merely says that Jang was willing to commit murder for multiple forms of consideration, but it doesn't say that that was on offer, it doesn't say that that was the agreement, and we could not possibly have inferred that that was an agreement. Judge Park, you asked about this very issue, but let me give you an example. Let's say, let's say I say, let's go to lunch on, I could do Monday or Friday, and you say, great, let's do Friday. And then we have lunch on Friday. Any onlooker is going to look at that fact pattern and think that we reached an agreement to do lunch on Friday. And what the government is saying is, no, no, no, no. You should have known that actually behind the scenes there was some sort of agreement that initially we agreed that we were going to do lunch on Monday, and then we changed our mind and Friday was a sort of substitute agreement. That is not an inference that any defense attorney is going to draw. No defense attorney is going to base their investigation on that implausible set of speculative assumptions, and we're certainly not going to mount a defense based on that. Now, the government also says that Allen Yu had multiple lines of attacks on Yu Yu in the closing argument. And in their brief they do discuss the various ways in which defense counsel tried to impeach Yu Yu's credibility. Defense counsel did the best job that they could with the hand that they had been played, but their single strongest line of attack, the utter implausibility of the promise that Yu Yu testified as to, that argument could not be made. Thank you. Thank you all. We will reserve decision.